**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Florence E. Stone, | ) | No. CV 09-01730-PHX-EHC |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Michael J. Astrue, Commissioner of Social Security, | ) | |
| Defendant. | ) | |

This is an action for judicial review of a denial of disability benefits under the Social Security Act, 42 U.S.C. § 405(g). The matter is fully briefed (Doc. 31 & 33). Plaintiff did not file a reply brief.

Plaintiff applied for disability benefits on January 13, 2006 (Administrative Record [Tr.] ) at approximately 50 years of age, alleging an onset of disability beginning October 1, 2002 (Tr. 12, 66). Plaintiff alleged impairments due to depression; bipolar disorder; anxiety; fibromyalgia; hypertension; osteoarthritis in both knees; back pain; poor eye sight; degenerative disc disease in her back and hips; plantar fasciitis; hand, ankle, and shoulder pain; chronic pain syndrome; and memory and concentration problems (Tr. 78, 93-96, 164). Plaintiff is insured for benefits through March 31, 2012 (Tr. 12). The Administrative Law Judge ("ALJ") listed Plaintiff's medically determinable impairments as back disorder

1  (spondylosis of the lumbar spine);[1] arthritis (osteoarthritis of the knees); mental depression;

2  and generalized anxiety disorder (Tr. 16).  Plaintiff's past relevant work was listed as

3  assembler, daycare provider, and home health aid (Tr. 24-25, 90-91, 113, 376).  Plaintiff has

4  a high school general equivalency degree (GED) (Tr. 355).

5        Plaintiff's application was denied initially and upon reconsideration (Tr. 12, 49-52, 57-

6  61).  Plaintiff timely requested a hearing before an ALJ (Tr. 12, 44, 347-386).  During the

7  hearing, Plaintiff, through counsel, amended her alleged disability onset date to January 1,

8  2006 (Tr. 12, 78, 349-350).  The ALJ denied Plaintiff's application (Tr. 12-25).  The Social

9  Security Appeals Council denied Plaintiff's request for review (Tr. 2-4), which was a final

10 decision.  Plaintiff filed her Complaint in this Court on August 20, 2009 (Doc. 1).  Defendant

11 filed an Answer on February 4, 2010 (Doc. 10).

12                                              **I.**

13                                   Standard of Review

14       A person is "disabled" for purposes of receiving social security benefits if he or she

15 is unable to engage in any substantial gainful activity due to a medically determinable

16 physical or mental impairment which can be expected to result in death or which has lasted

17 or can be  expected to last for a continuous period of at least twelve months.  Drouin v.

18 Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  Social Security disability cases are evaluated

19 using a five-step sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520 and

20 416.920 to determine whether the claimant is disabled.  The claimant has the burden of

21 demonstrating the first four steps.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

22       In the first step, the ALJ must determine whether the claimant currently is engaged in

23 substantial gainful activity; if so, the claimant is not disabled and the claim is denied.

24

25        [1]Spondylosis refers to "ankylosis" (stiffening or fixation) of the vertebra, often applied
26 non-specifically to any lesion of the spine of a degenerative nature.  Stedman's Medical
   Dictionary, at 90, 1678 (27th ed. 2000); Crawford v. Astrue, 633 F. Supp. 2d 618, 627 n.2
27 (N.D. Ill. 2009).

28                                             - 2 -

1    If the claimant is not currently engaged in substantial gainful activity, the second step

2 requires the ALJ to determine whether the claimant has a "severe" impairment or combination

3 of impairments which significantly limits the claimant's ability to do basic work activities;

4 if not, a finding of "not disabled" is made and the claim is denied.

5    If the claimant has a "severe" impairment or combination of impairments, the third step

6 requires the ALJ to determine whether the impairment or combination of impairments meets

7 or equals an impairment listed in the regulations; if so, disability is conclusively presumed and

8 benefits are awarded.

9    If the impairment or impairments do not meet or equal a listed impairment, the ALJ

10 will make a finding regarding the claimant's "residual functional capacity" based on all the

11 relevant medical and other evidence in the record.  A claimant's residual functional capacity

12 ("RFC") is what he or she can still do despite existing physical, mental, nonexertional and

13 other limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

14    At step four, the ALJ determines whether, despite the impairments, the claimant can

15 still perform "past relevant work"; if so, the claimant is not disabled and the claim is denied.

16 The claimant has the burden of proving that he or she is unable to perform past relevant work.

17 If the claimant meets this burden, a prima facie case of disability is established.

18    The Commissioner bears the burden as to the fifth and final step in the analysis  of

19 establishing that the claimant can perform other substantial gainful work. The Commissioner

20 may meet this burden based on the testimony of a vocational expert or by reference to the

21 Medical-Vocational Guidelines.  Tackett, 180 F.3d at 1099.

22    The Court has the "power to enter, upon the pleadings and transcript of record, a

23 judgment affirming, modifying, or reversing the decision of the Commissioner of Social

24 Security, with or without remanding the cause for rehearing."  42 U.S.C. § 405(g). The

25 decision to deny benefits should be upheld unless it is based on legal error or is not supported

26 by substantial evidence.  Ryan v. Commissioner of Social Security, 528 F.3d 1194, 1198 (9th

27 Cir. 2008).  Substantial evidence means "such relevant evidence as a reasonable mind might

28

- 3 -

1   accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91

2   S.Ct. 1420, 1427 (1971). "Substantial evidence is more than a mere scintilla but less than a

3   preponderance." <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005) (internal

4   quotation marks and citation omitted). The Court must consider the record in its entirety and

5   weigh both the evidence that supports and the evidence that detracts from the Commissioner's

6   conclusion. <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir.1985).

**II.**

Background Facts

(A)   Plaintiff's 2006 Medical Records - Drs. Weldon and Blatny

In February 2006, Plaintiff was examined by Donald C. Weldon, M.D., regarding arthritis, back pain, arm and shoulder pain, hypertension, dyslipidemia,[2] depression, and cataracts (Tr. 272-274). Plaintiff reported living with her husband and two step-children, working for Health and Human Services as a community assistant 17.5 hours a week, and moving from Arizona to Nebraska in 2002 (Tr. 272). Dr. Weldon's assessment of Plaintiff included:  smoker, hypertension (noncompliant with treatment), dyslipidemia (noncompliant with treatment), bilateral cataracts with visual impairment, gastroesophageal reflux disease (GERD), irritable bowel syndrome, anxiety/depression, menometrorrhagia (excessive uterine bleeding) (suspect perimenopausal), left ulnar (forearm) neuropathy symptoms, chronic pain, and history of workplace injury (Tr. 276).  X-rays of Plaintiff's spine in February 2006, revealed "mild spondylosis deformans.  No acute osseous [bony] abnormalities" (Tr. 278).

In March, May and June 2006, Richard Blatny, Jr., M.D., assessed Plaintiff with HTN (hypertension), hyperlipidemia, anxiety and foot pain (Tr. 290, 291, 203). Dr. Blatny initially assessed foot pain more likely related to Plaintiff's shoes and walking surfaces. At the June exam, Plaintiff also complained of swelling and fatigue and Dr. Blatny observed "noticeable

---

[2]Dyslipidemia refers to a condition marked by abnormal concentrations of lipids or lipoproteins in the blood.  <u>See</u> <u>Rivera v. Commissioner of Social Sec.</u>, 728 F. Supp. 2d 297, 307 n.9 (S.D.N.Y. 2010).

- 4 -

edema from her knees down bilaterally, and this is new" (Tr. 203).  Dr. Blatny assessed weight gain and fatigue and prescribed a diuretic drug (Tr. 203). On August 28, 2006, Plaintiff told Dr. Blatny she was doing okay but was convinced she had fibromyalgia,[3] listing several symptoms (Tr. 203).  Plaintiff said she was not able to do activity due to pain from fibromyalgia. Dr. Blatny assessed fatigue, multiple chronic pain syndrome consistent with osteoarthritis and likely fibromyalgia (Tr. 202).

On October 2, 2006, Dr. Blatny, at Plaintiff's request (Tr. 202), wrote a letter to Plaintiff's attorney (Tr. 191), stating that Plaintiff had been a patient for several years and had experienced progressive pain. Dr. Blatny described the pain as widespread, throughout Plaintiff's head, neck, shoulders, back and legs, mostly in muscle areas, but there was some joint involvement consistent with arthritis. An extensive past work-up was essentially negative. Dr. Blatny opined that Plaintiff met the criteria for the diagnosis of fibromyalgia, which was the cause for most of her pain, and that Plaintiff was under a lot of emotional stress.  Dr. Blatny opined: "[c]ertainly, from my standpoint, she would meet the diagnostic criteria for this disease syndrome.  There is no concrete testing that can be done for the diagnosis.  Rather this is a diagnosis of exclusion by history" (Tr. 191).

In November 2006, Plaintiff reported to Dr. Blatny that overall she was doing okay except for her usual aches and pains, fibromyalgia and arthritis (Tr. 202).  Plaintiff's lab work looked "very good." Dr. Blatny assessed chronic pain syndrome secondary to fibromyalgia and arthritis, hyperlipidemia, and fatigue, and continued Plaintiff's medications (Tr. 202). In December 2006, Dr. Blatny treated Plaintiff for left knee pain, noting pain with full

---

[3]Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissue.  Common symptoms include chronic body pain, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate pain and fatigue. Benecke v. Barnhart, 379 F.3d 587, 589 (9th Cir. 2004).

1   extension, marked crepitance in the knee and tenderness along both joint lines, assessed

2   osteoarthritis of the left knee, and administered an injection for the pain (Tr. 201).

3   (B)     Plaintiff's Psychological Evaluation - February 2006

4           On February 27, 2006, Allen Meyer, Ph.D., performed a psychological evaluation of

5   Plaintiff (Tr. 281-285). Plaintiff's results on the Wechsler Memory Scale III (WMS-III)

6   placed her within the average range of ability. Dr. Meyer diagnosed generalized anxiety

7   disorder and rated Plaintiff's global assessment of functioning (GAF) at 55, which is

8   indicative of an individual with moderate difficulty in social, occupational, or school

9   functioning (Tr. 284; Doc. 33 at 15). Dr. Meyer found that Plaintiff would have no restrictions

10  in her activities of daily living, would have some difficulties in social functioning due to being

11  nervous around new people or unfamiliar places, and would be able to sustain concentration

12  and attention needed for task completion. Plaintiff could remember and understand short

13  simple instructions under ordinary supervision, would have difficulty relating appropriately

14  to co-workers and when she had to meet new people or go to new places, and no difficulty

15  adapting to changes in her environment (Tr. 286).

16  (C)     State Agency Non-Examining Medical Opinions - 2006

17          On March 22, 2006, Linda Schmechel, Ph.D., a State Agency psychologist, reviewed

18  the medical evidence and opined that Plaintiff had generalized anxiety disorder which resulted

19  in moderate limitations in her ability to maintain social functioning (Tr. 246-262 [Tr. 246,

20  251, 256]). Dr. Schmechel's mental residual functional capacity assessment  indicated that

21  Plaintiff would be moderately limited in her ability to perform activities within a schedule,

22  maintain attendance, work in coordination with or proximity to others without being distracted

23  by them, interact appropriately with the public, accept instructions, and complete a normal

24  workday and workweek without psychological interruptions (Tr. 260-261). On July 24, 2006,

25  Dr. Schmechel's assessment was affirmed by  Rebecca K. Braymen-Lawyer, Ph.D., who

26  reviewed the updated medical records (Tr. 245).  Also on July 24, 2006, P.E. Horley, M.D.,

27  reviewed the medical records and noted that Plaintiff's daily living activities showed she did

28
                                          - 6 -

1   chores, had some difficulty with close up work and was still driving (Tr. 167).  Dr. Horley

2   affirmed a March 22, 2006 residual functional capacity assessment that Plaintiff would be able

3   to perform a modified range of light work (Tr. 167, 236-244).

4   (D)    Plaintiff's 2007-2008 Medical Records - Drs. Blatny and Weldon

5           In July 2007, Plaintiff complained to Dr. Blatny of stress, depression at times and being

6   easily angered (Tr. 200).  Dr. Blatny assessed fatigue, depression, and "palpitations, question

7   stress related" and recommended Cymbalta (Tr. 200), which is used to treat major depressive

8   disorders,  generalized  anxiety  disorders,  diabetic  peripheral  neuropathic  pain,  and

9   fibromyalgia (Doc. 33 at 12 n. 3).  In August 2007, Plaintiff appeared "upbeat" and responsive

10  to Cymbalta. Dr. Blatny assessed depression with interval improvement and prescribed

11  Cymbalta daily (Tr. 200). However, in October 2007, Plaintiff complained to Dr. Blatny of

12  depressive type symptoms and said she had ceased taking Cymbalta because she could not

13  tolerate it and was taking an herbal treatment (Tr. 199). Plaintiff complained of pain in her

14  knees and said she had been "really busy" with daycare. Dr. Blatny assessed HTN stable,

15  hyperlipidemia stable, and "severe arthritis, diffuse".  Plaintiff declined Dr. Blatny's offer of

16  an orthopedic referral and hormone therapy for suspected perimenopausal symptoms. Dr.

17  Blatny recommended smoking cessation and continued her prescribed medications (Tr. 199).

18          On April 9, 2008, Plaintiff complained to Dr. Blatny about depression, mentioning a

19  break up with her husband, chronic bilateral knee pain and chronic back pain (Tr. 199). Dr.

20  Blatny recommended Sertraline therapy, a generic version of Zoloft an antidepressant

21  medication (Tr. 199; Doc. 33 at 13 n. 4). Dr. Blatny recommended weight loss and exercise

22  to relieve the pain and noted his previous Darvocet prescription appeared helpful (Tr. 199).

23  Dr. Blatny diagnosed obesity and diffuse osteoarthritis and continued Plaintiff's current

24  medications (Tr. 198).

25          On May 1, 2008, Plaintiff was examined by Dr. Weldon following Dr. Blatny's

26  referral (Tr.184).  Dr. Weldon noted "handicap sticker, occasional cane". Plaintiff had not

27  seen an orthopedist following Dr. Blatny's recommendation for a bilateral total knee

28

arthroplasty (TKA). Dr. Weldon's assessment included osteoarthritis knees, chronic pain, fibromyalgia by history and anxiety (Tr.184).  On June 13, 2008, Plaintiff asked Dr. Weldon about Amrix to treat fibromyalgia.  Plaintiff reported anxiety and mentioned a pending deposition of her mother (Tr. 183). Dr. Weldon's assessment included fibromyalgia and anxiety and he provided samples of Pristiq for anxiety. A June 16, 2008 note showed a prescription for cyclobenzaprine instead of Amrix (Tr. 183). On June 26, 2008, Plaintiff saw Dr. Weldon regarding her anxiety and anger (Tr. 183). Dr. Weldon noted Plaintiff's family members with bipolar disorder and that Plaintiff reported seeing a psychologist. Dr. Weldon assessed fibromyalgia Amrix 30 responsive, bipolar,[4] and HTN. Dr. Weldon offered authorization for Amrix, provided samples of Symbyax, and recommended a psychiatrist referral (Tr. 183).

On July 11, 2008, Plaintiff reported to Dr. Weldon for follow-up regarding her bipolar disorder and intolerance of Symbyax. Plaintiff said several relatives were taking Depakote. Dr. Weldon diagnosed bipolar disorder and prescribed Depakote (Tr. 182).  On July 21, 2008, Dr. Weldon observed that Plaintiff appeared responsive to Depakote and noted her pleasant mood. Dr. Weldon assessed bipolar disorder Depakote responsive, and fibromyalgia (Tr. 182).

On August 18, 2008, Plaintiff reported to Dr. Weldon that she had forgotten to take her Depakote and her husband and mother noted hostility (Tr. 182).  Dr. Weldon observed no mood or thought disorder and opined that Plaintiff conveyed a "sense of chronic functional insufficiency".  Dr. Weldon diagnosed "bipolar/chronic musculoskeletal pain" and continued Plaintiff's current medications (Tr. 182).

(E)   Plaintiff's Eye Surgery 2005-2008

An October 2005 eye examination noted a decrease in Plaintiff's vision due to development of cataracts in both eyes (Tr. 270-271).  Cataract surgery and lens implants were

---

[4]Bipolar disorder refers to manic depressive illness and is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. United States v. Kilkeary, 2011 WL 339460 *4 n.2 (3d Cir. 2011).

1  performed in Plaintiff's eyes in February and March 2007 (Tr. 219, 224, 226, 229, 232).  On

2  June 6, 2008, Dr. Gordon Stelting treated Plaintiff post- surgery.  Plaintiff's vision in her right

3  eye was 20/20 and 20/50 in her left eye (Tr. 194).

4                                      **III.**

5                      The Hearing Before the ALJ: October 21, 2008

6      Plaintiff, represented by counsel, and the Vocational Expert ("VE") Steven Kuhn

7  testified at the hearing. Plaintiff amended her onset date to January 1, 2006 (Tr. 349-350,

8  355).  Plaintiff testified she was 52 years of age, 5'10" tall, and weighed about 258 pounds

9  (Tr. 355).  Plaintiff tried to do children's daycare in her home from October 2007 to January

10  2008 but could not pick up the children, stand or cook, or do the job (Tr. 356).  Plaintiff

11  described her sister as "mentally handicapped" and said she took care of her about three and

12  one-half hours per day (Tr. 357, 370).  Plaintiff's past care of her mother was about 3 hours

13  per week. She presently cares for her mother, who lives with her, about 10 hours and 55

14  minutes a week (Tr. 357).

15      Plaintiff said her pain is constant, is located in her back, arms, hands and knees, and

16  interferes with her daily living (Tr. 358).  Plaintiff can stand and do dishes but after a few

17  minutes she has to sit down and take a 15 to 30 minute break (Tr. 358-359).  Her  ability to

18  stand is sometimes for a shorter period depending on the pain (Tr. 359). She has days when

19  she cannot do anything around the house and sits in a recliner or lies down (Tr. 359).  She has

20  5 out of 7 "bad days" (Tr. 359) and this has gotten "worse" since January 2006 (Tr. 359-360).

21  Plaintiff said she does not sleep well due to pain constantly, she tires easily, and she takes a

22  nap for 2 to 3 hours (Tr. 360).  This occurs 6 out of 7 days (Tr. 360).

23      Plaintiff said she has problems interacting with people and that during her past

24  employment she had to leave  the workplace if a lot of people were going to be in the same

25  area (Tr. 360-361).  Due to her anxiety, Plaintiff tries not to go out much to places where there

26  are a lot of people (Tr. 361).  Her anxiety "flares up" when she has to go some place new (Tr.

27  362).  She also has panic attacks (Tr. 362). The medications prescribed by Drs. Weldon and

28                                      - 9 -

1    Blatny have not helped her anxiety (Tr. 362-363).  Plaintiff has not seen a counselor for her

2    anxiety and bipolar disorder due to lack of money and health insurance coverage (Tr. 363).

3        Plaintiff said that extreme foot pain, which feels like bruising, limits her standing and

4    walking (Tr. 363).  Plaintiff said on "bad days" it is a "chore" to walk from the house to the

5    mailbox, and on "other days" she can walk halfway around the block (Tr. 364).  Plaintiff

6    experiences pain in her leg and back when sitting, stating she can sit for an hour to an hour-

7    and-a-half (Tr. 364). Plaintiff said she cannot get through an 8-hour day by alternating sitting,

8    standing and walking because when she is in severe pain she props her leg up (Tr. 365).  She

9    also has to take a nap (Tr. 365). Plaintiff said she forgets things very easily (Tr. 365).

10       When questioned by the ALJ, Plaintiff testified she is paid $7.22 an hour for caring for

11   her mother (Tr. 367).  Plaintiff has been caring for her mother since 2004 and said she helps

12   her mother wash her hair, takes her to the doctor, and cooks the evening meal but no lifting

13   (Tr. 368-369). Plaintiff cared for her sister between 2003 and July/August 2007 and was paid

14   $6.50 per hour (Tr. 369).  Plaintiff said she helped teach her sister how to grocery shop (Tr.

15   370). Plaintiff described her past work as custom cable assembly for electronics for two years

16   (Tr. 372-373).  She stopped because she could not read the blueprints (Tr. 373).  Plaintiff said

17   she had cataract surgery in both eyes in 2007 but could not see any better (Tr. 373-374).

18   Plaintiff has a driver's license with no restriction or endorsement for glasses (Tr. 374).

19   Plaintiff has difficulty seeing "small stuff" and claimed her vision is not correctable (Tr. 375).

20       The VE testified that work as an assembler is light, unskilled; that work as a daycare

21   provider is light semi-skilled; and that work as a home health aid (such as caring for Plaintiff's

22   mother and sister) is light (Tr. 376, 381).  Based on a hypothetical question that included

23   moderate limitations in dealing with the general public and large numbers of co-workers, the

24   VE testified that Plaintiff could perform her past relevant work as an assembler,  home health

25   aid, and daycare provider (Tr. 377-378).  When questioned by Plaintiff's counsel, the VE

26   testified that all work would be precluded given Plaintiff's testimony regarding the limitations

27   on standing, walking and lifting (Tr. 383-385).

28

## IV.

### The ALJ's Findings

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended onset date of January 1, 2006 (Tr. 15), and that Plaintiff's medically determinable impairments were a back disorder (spondylosis of the lumbar spine), arthritis (osteoarthritis of the knees), mental depression and generalized anxiety disorder (Tr. 16). Plaintiff did not have an impairment or combination of impairments that met the listing criteria under the regulations (Tr. 23).

The ALJ gave little weight to Plaintiff's testimony and statements based on a finding that Plaintiff had not been fully credible (Tr. 24). The ALJ found that Plaintiff had overstated the degree of her impairments based on the following: the medical evidence does not show that Plaintiff has any type of impairment that could be expected to cause such major limitations as Plaintiff described; Plaintiff is not taking any prescription pain medications; Plaintiff testified that her vision had not improved after her cataract surgery when the medical evidence showed otherwise; Plaintiff testified that she takes a nap everyday when no physician of record indicated a need for sleep 2-3 hours during the day; medical records showed treatment on a sporadic basis regarding her physical symptoms; the lack of treating history regarding her mental symptoms; and, Plaintiff's daily activities, including caring for her mother, suggest she is functioning at a fairly high level (Tr. 22-23). The ALJ included as relevant to the credibility finding that Plaintiff had engaged in substantial gainful activity after the alleged onset date from a previous application dated August 19, 1994 and after her original alleged onset date of October 1, 2002 from her current application (Tr. 15).

The ALJ found that although the evidence showed a diagnosis of fibromyalgia, the file showed minimal medical findings to justify the diagnosis (Tr. 24). The medical evidence also showed that Plaintiff's hypertension was well-controlled with medication (Tr. 24).

The ALJ found that Plaintiff's determinable mental impairments of mental depression and generalized anxiety disorder were "severe" (Tr. 23). After discussing that the case

1  showed that Plaintiff had moderate limitations on social functioning due to her depression and
2  anxiety, the ALJ found that the medical records showed her depressive symptoms had
3  improved on psychotropic medications such as Cymbalta and Depakote (Tr. 24).

4      The ALJ found that Plaintiff has the residual functional capacity for light work with
5  additional non-exertional limitations (Tr. 23). The ALJ concurred with the DDS opinion that
6  Plaintiff has moderate limitations in her social interaction, but no other significant mental
7  limitations, and that she is moderately limited in dealing with the general public, with co-
8  workers and supervisors. The ALJ found Plaintiff capable of performing her past work as
9  assembler, daycare provider and home health aid, and that she is not disabled (Tr. 24-25).

10                                    **V.**

11                                 Discussion

12      Plaintiff contends that the ALJ erred in finding that Plaintiff was not credible and in
13  failing to afford adequate weight to the opinion of her treating physician Dr. Blatny. Plaintiff
14  argues in favor of reversal for an award of disability benefits or, in the alternative, remand for
15  a new hearing before a different ALJ. Defendant argues that the ALJ's decision should be
16  affirmed.

17      The Court first considers the ALJ's consideration of Dr. Blatny's opinion. Defendant
18  has responded to Plaintiff's argument by noting that Plaintiff's objection is that the ALJ did
19  not consider fibromyalgia as one of her severe impairments (Doc. 33 at 29).

20      "By rule, the Social Security Administration favors the opinion of a treating physician
21  over non-treating physicians." See Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing
22  20 C.F.R. § 404.1527). Where a treating doctor's opinion is uncontradicted, an ALJ may
23  reject it only for "clear and convincing" reasons; however, a contradicted opinion of a treating
24  or examining physician may be rejected for "specific and legitimate" reasons supported by
25  substantial evidence in the record. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

26      The record shows that Dr. Weldon included in Plaintiff's assessments chronic pain in
27  February 2006 (Tr. 276) and fibromyalgia, anxiety, chronic musculoskeletal pain and bipolar

28                                  - 12 -

1  disorder in June, July and August 2008 (Tr. 183, 182). Dr. Blatny assessed fatigue, multiple

2  chronic pain syndrome consistent with osteoarthritis and fibromyalgia regarding Plaintiff's

3  examinations in August and November 2006 (Tr. 200, 202). In his October 2, 2006 letter, Dr.

4  Blatny said Plaintiff had been his patient for several years and described Plaintiff's pain as

5  widespread throughout her head, neck, shoulders, back and legs, in muscle areas and joints

6  consistent with arthritis (Tr. 191). Dr. Blatny opined that Plaintiff met the criteria for a

7  fibromyalgia diagnosis and referenced the diagnosis as "exclusion by history" (Tr.191).

8  Plaintiff testified regarding constant pain in her back, arms, hands and knees, that she has to

9  take breaks, the pain interferes with her sleep, and she tires easily (Tr. 358-360).

10      Fibromyalgia is a disease that eludes objective evidence. Benecke v. Barnhart, 379

11  F.3d 587, 590, 594 (9th Cir. 2004)("[f]ibromyalgia's cause is unknown, there is no cure, and

12  it is poorly-understood within much of the medical community"). "The process of diagnosing

13  fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the

14  ruling out of other possible conditions through objective medical and clinical trials." Rogers

15  v. Commissioner of Social Security, 486 F.3d 234, 244 (6th Cir. 2007). In Benecke, the ALJ

16  erred in requiring objective evidence for a disease such as fibromyalgia that "is diagnosed

17  entirely on the basis of patients' reports of pain and other symptoms". Benecke, 379 F.3d at

18  590, 594.

19      "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on

20  a claimant's self-reports that have been properly discounted as incredible." Tommasetti v.

21  Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008). In this case, however, the ALJ found that the

22  record showed minimal medical findings regarding the fibromyalgia diagnosis (Tr. 24),

23  describing the record as showing benign examinations regarding physical impairments, such

24  as x-rays of the lumbar spine showing mild spondylosis and range of motion in both knees

25  (Tr. 24). However, this "benign" evidence seems consistent with Dr. Blatny's reference to

26  the fibromyalgia diagnosis "of exclusion by history." Fibromyalgia patients may "present no

27  objectively alarming signs" and may "manifest normal muscle strength and neurological

28

1    reactions and have a full range of motion." <u>Rogers</u>, 486 F.3d at 243-244(noting that objective

2    tests are of little relevance in determining the existence or severity of fibromyalgia).

3    Moreover, Dr. Weldon included fibromyalgia in Plaintiff's assessments.

4          As for the ALJ's concern that minimal medical findings supported the fibromyalgia

5    diagnosis (noting lack of trigger points on examination), the ALJ should have attempted to

6    develop the record further by contacting the treating physician to determine whether required

7    information is available.  See 20 C.F.R. § 404.1512(e).  The ALJ could have obtained an

8    explanation from Dr. Blatny regarding his August 2006 report that Plaintiff listed several

9    fibromyalgia symptoms and his October 2006 letter stating that Plaintiff met the criteria for

10   a fibromyalgia diagnosis.  An ALJ's duty to develop the record is triggered when there is

11   ambiguous evidence or when the record is inadequate to allow for proper evaluation of the

12   evidence.  <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-460 (9th Cir. 2001).  "The ALJ in a social

13   security case has an independent duty to fully and fairly develop the record and to assure that

14   the claimant's interests are considered."  <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir.

15   2001)(internal quotation marks and citations omitted).  This duty applies even where the

16   claimant is represented by counsel.  <u>Celaya v. Halter</u>, 332 F.3d 1177, 1183 (9th Cir. 2003).

17   Remand for further proceedings is appropriate in this case because outstanding issues remain

18   that must be resolved before a determination of disability can be made.  <u>Varney v. Sec'y of</u>

19   <u>HHS</u>, 859 F.2d 1396, 1400 (9th Cir. 1988).

20         Upon remand, a more complete report from Dr. Blatny regarding his findings that

21   support the fibromyalgia diagnosis should be obtained.  Dr. Weldon also diagnosed Plaintiff

22   with fibromyalgia and a more complete report should be obtained from this physician as well.

23   It further may be helpful to obtain residual functional capacity reports from these physicians.

24   After such reports are obtained, Defendant will be better able to make a well-reasoned

25   decision as to the weight to be given the opinions of Plaintiff's treating physicians.

26         Additional issues should be clarified upon further development of the record. "Social

27   Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to

28                                              - 14 -

1    investigate the facts and develop the arguments both for and against granting benefits." <u>Sims</u>

2    <u>v. Apfel</u>, 530 U.S. 103, 110-111 (2000)(citing <u>Richardson v. Perales</u>, 402 U.S. 389, 400-401

3    (1971)).

4            Plaintiff's medical records show depression and anxiety diagnosed by Dr. Weldon and

5    Dr. Blatny between 2006 and 2008 (Tr. 276, 291, 200, 199, 184, 183).  In February 2006, Dr.

6    Meyer diagnosed generalized anxiety disorder and discussed Plaintiff's difficulties in social

7    functioning, relating to co-workers, meeting new people and in going to new places. Dr.

8    Meyer noted Plaintiff's report of difficulty falling asleep because of her mind racing, recurring

9    episodes of deterioration whenever she had to meet new people, and increasing problems with

10   anxiety over the years ((Tr. 281-285). Dr. Schmechel, a State Agency psychologist, noted

11   Plaintiff's generalized anxiety disorder as of March 2006 (Tr. 246-262). Dr. Schmechel

12   reported moderate limitations in Plaintiff's ability to perform activities within a schedule,

13   maintain attendance, work in coordination with or in proximity to others, interact

14   appropriately with the public, accept instructions, and complete a normal workday and

15   workweek without psychological interruptions (Tr. 260-261).  Other State Agency reviewing

16   assessments occurred in July 2006 (Tr. 245, 167).

17           Plaintiff's care-giving activities for her sister and mother have been part-time. Plaintiff

18   testified she could not do the job of operating a child daycare in her home between October

19   2007 and January 2008 (Tr. 356).  Plaintiff testified she has problems interacting with people

20   causing her in the past to leave the workplace (Tr. 360-361).  She reported increased anxiety

21   when going someplace new (Tr. 362). Plaintiff's testimony on these issues seems consistent

22   with Dr. Meyer's and Dr. Schmechel's findings regarding Plaintiff's limitations.

23           In June, July and August, 2008, Dr. Weldon diagnosed Plaintiff with bipolar disorder

24   (Tr. 183, 182).  In June 2008, Plaintiff reported seeing a psychologist (Tr. 183). However, the

25   record does not contain any psychological evaluations or residual functional capacity

26   assessments dated after July 2006 that take into account Plaintiff's depression, generalized

27   anxiety disorder *and* bipolar disorder. This issue should be clarified on remand.

28                                                - 15 -

1    Plaintiff's claims of error regarding the ALJ's credibility determination warrant some

2    discussion for purposes of remand. Credibility determinations bear on evaluations of medical

3    evidence when an ALJ is presented with conflicting medical opinions or inconsistency

4    between a claimant's subjective complaints and diagnosed condition. See Webb v. Barnhart,

5    433 F.3d 683, 688 (9th Cir. 2005).

6    Regarding Plaintiff's argument that the ALJ erred in finding she was not taking

7    prescription pain medications, Defendant concedes this error but argues it was harmless (Doc.

8    33 at 25-26).  Medical records show that Plaintiff was prescribed various pain medications,

9    e.g., (Tr. 184, 199 (Darvocet); Tr. 200 & Doc. 33 at 12 n.3 (Cymbalta); Tr. 183 (Amrix)).

10   The ALJ found that Plaintiff's testimony that her vision had not improved following

11   her cataract surgery was inconsistent with Dr. Stelting's post-surgery report showing vision

12   improvement  (Tr. 194).  It may be appropriate for Plaintiff to clarify this issue on remand

13   since she now claims that she misstated this point at the hearing (Doc. 31 at 25).

14   Plaintiff argues error in the ALJ's credibility finding that no physician prescribed

15   Plaintiff's 2 to 3-hour daily naps.  A claimant's limitation which is self-imposed rather than

16   a medical necessity is a basis on which an ALJ may discredit a claimant's alleged limitation.

17   See Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007).  Medical records show Plaintiff's

18   reports of fatigue and pain (Tr. 272-276, 203, 202, 201, 200,199, 191, 184, 182).  Plaintiff

19   testified that pain interferes with her sleep (Tr. 360). The relevant issue is whether Plaintiff's

20   condition compels her to nap as she claims and the effect on her residual functional capacity.

21   Plaintiff argues error in the ALJ's credibility finding that she obtained sporadic

22   treatment (no emergency room visits or hospitalization) for her physical symptoms  and in not

23   considering  Plaintiff's  explanation  that  she  could  not  afford  certain  treatment.

24   Noncompliance with medical care or unexplained or inadequately explained reasons for

25   failing to seek medical treatment may cast doubt on a claimant's subjective complaints.  Fair

26   v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  However, "disability benefits may not be

27   denied because of the claimant's failure to obtain treatment he cannot obtain for lack of

28

1   funds." <u>Gamble v. Chater</u>, 68 F.3d 319, 321 (9th Cir. 1995).  The record should be further
2   developed to clarify the available medical resources in light of Plaintiff's financial
3   circumstances.

4         Plaintiff argues that the ALJ erred in finding that Plaintiff's allegations of physical and
5   mental limitations were belied by her daily activities and in not considering information
6   provided by third parties. The ALJ must make specific findings relating to a claimant's daily
7   activities and their transferability to a work setting to conclude that a claimant's daily
8   activities warrant an adverse credibility determination.  <u>Orn</u>, 495 F.3d at 639. In any event,
9   these and the other issues relevant to credibility should be reconsidered or clarified as
10  appropriate upon remand based on a re-examination of the medical evidence, including
11  additional medical reports and residual functional capacity information.

12        Plaintiff requests that the matter be given to a different ALJ on remand.  Although
13  courts have ordered or recommended that the Commissioner assign a case to a different ALJ
14  on remand, e.g., <u>Miles v. Chater</u>, 84 F.3d 1397, 1401 (11th Cir. 1996), the selection of a new
15  ALJ on remand has been considered to be within the discretion of the Commissioner. <u>Hartnett</u>
16  <u>v. Apfel</u>, 21 F. Supp. 2d 217, 222 (E.D.N.Y. 1998). The Court will deny Plaintiff's request
17  without prejudice but will recommend that the matter be assigned to a different ALJ and that
18  a decision in the case be expedited.

19        Accordingly,

20        **IT IS ORDERED** that the decision of the Commissioner denying Plaintiff's claim for
21  benefits is vacated and the case is remanded for further proceedings consistent with this
22  Order.  The Court recommends that the matter be assigned to a different ALJ on remand and
23  that a decision in the case be expedited.

24  //
25  //
26  //
27  //
28
                                     - 17 -

1      **IT IS FURTHER ORDERED** that the Clerk of Court shall enter Judgment

2  accordingly.

3      DATED this 29th day of March, 2011.

4

5

6  _____
                     Earl H. Carroll
7              United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28